IN THE MATTER OF JAMES N. ELLIS, JR.
IN THE MATTER OF NICHOLAS J. ELLIS.

Suffolk. June 10, 1997. - June 27, 1997.

Present: WILKINS, C.J., LYNCH, O'CONNOR, GREANEY, FRIED, & MARSHALL, JJ.

*Attorney at Law,* Disciplinary proceeding, Suspension. *Due Process of Law,* Attorney disciplinary proceeding.

This court concluded that, if bar counsel files a petition pursuant to § 12A of S.J.C. Rule 4:01, an order of temporary suspension may be entered, if explicit and persuasive facts, established by affidavit or otherwise, show that the lawyer in question violated a disciplinary rule of the court and, on a balance of the harms and consideration of the public interest, the lawyer poses a threat of substantial harm to present or future clients or in other respects. [334]

This court concluded that, on the basis of the record before the single justice, on bar counsel's petition pursuant to § 12A of S.J.C. Rule 4:01, and after the attorneys were afforded notice and an opportunity to be heard, an order of temporary suspension of two lawyers should be entered. [338-343]

PETITIONS filed in the Supreme Judicial Court for the county of Suffolk on April 3, 1997.

The cases were heard by *Abrams*, J.

*Nancy E. Kaufman*, Assistant Bar Counsel.

*Max D. Stern* for James N. Ellis, Jr.

*Michael Avery* for Nicholas J. Ellis.

The following submitted briefs for amici curiae:

*Frederic N. Halstrom & John J. St. Andre, Jr.*, for the Massachusetts Academy of Trial Attorneys.

*Cheryl Flax-Davidson* for the Association of Trial Lawyers of America.

*Janice Bassil & Joseph J. Balliro* for the Massachusetts Association of Criminal Defense Lawyers.

*Joel M. Reck & Richard L. Neumeier* for the Boston Bar Association.

*Michael E. Mone, William F. Looney, Jr., & Benjamin Fierro, III*, for the Massachusetts Bar Association.

WILKINS, C.J. James N. Ellis, Jr., and Nicholas J. Ellis, members of the bar of the Commonwealth and the only partners in the law firm of Ellis & Ellis, appeal from orders of a single justice of this court temporarily suspending them from the practice of law, pursuant to S.J.C. Rule 4:01, § 12A, as appearing in 394 Mass. 1110 (1985) (hereinafter § 12A).

On March 3, 1997, a Worcester County grand jury returned twenty-eight indictments against James N. Ellis, Jr., charging tax evasion, conspiracy to evade income taxes, presentation of false statements to insurance companies in violation of G. L. c. 266, § 111A or § 111B, larceny from insurance companies, and conspiracy to commit fraud or steal money from insurance companies. These indictments cover the years 1985 to 1995, inclusive. On the same day, the same grand jury returned twelve indictments against Nicholas J. Ellis charging him with presenting false statements to insurance companies, larceny from insurance companies, attempted larceny from an insurance company, and conspiracy to commit insurance fraud. These indictments cover the years 1990 to 1993, inclusive.

Early in April, 1997, bar counsel petitioned for the temporary suspension of both lawyers. A single justice of this court held a hearing on the petitions on April 24. On April 30 the single justice entered orders of temporary suspension and stayed the effectiveness of her orders to permit the lawyers to seek relief from the full court. We then stayed the effectiveness of the temporary suspensions and heard oral argument on June 10.

The single justice's orders took note of the pending indictments and of the issuance of warrants authorizing the search of the lawyers' law offices. She stated that the indictments and search warrants themselves "suggest probable cause to support the claim of serious criminal conduct" and concluded that the charges against each lawyer were supported by probable cause. As to James Ellis, the single justice also noted that a Federal court judge had enjoined him and Ellis & Ellis from disposing of any firm assets, except in the regular course of business, until a civil action brought by an insurance company was concluded.

The single justice did not explicitly find, by a preponderance of the evidence, that either lawyer had committed a violation of the Code of Professional Responsibility. Nor did

she state explicitly that either posed such a threat of substantial harm to clients or prospective clients that, on a balance of considerations, a temporary suspension was called for. We have reviewed the record before the single justice and explicitly reach those conclusions ourselves.[1] We, therefore, affirm the orders of temporary suspension.

Section 12A of S.J.C. Rule 4:01, which is set forth in full in the margin,[2] provides that, if bar counsel files a petition "alleging facts showing that an attorney poses a threat of substantial harm to his clients or prospective clients," this court or a Justice, "after affording the attorney opportunity to be heard, may make such order of suspension or restriction as protection of the public may make appropriate." We conclude that an order of temporary suspension may be entered if (1) facts, established by a preponderance of the evidence, show that the lawyer violated a disciplinary rule of this court and (2) on a balance of the harms and consideration of the public interest, the lawyer poses a threat of substantial harm to present or future clients or in other respects. We decline to adopt the somewhat amorphous standard of "clear and convincing proof," but we do require that the threatened harm be shown to be substantial and that the facts on which any temporary suspension order is based, established by affidavit or otherwise, be explicit and persuasive. *Matter of Mayberry*, 295 Mass. 155, 167 (1936).

1. First, we set forth the facts in the record before the single justice that lead us to conclude that an order of temporary suspension of each lawyer should be entered. Our decision is based on the cumulative effect of the following

---

[1]We do not consider materials that bar counsel has submitted that were not before the single justice.

[2]"Upon the filing with this court of a petition by the Bar Counsel alleging facts showing that an attorney poses a threat of substantial harm to his clients or prospective clients, this court shall enter an order to show cause why the attorney should not be immediately suspended from the practice of law pending final disposition of any disciplinary proceeding commenced by the Bar Counsel. The court or a justice, after affording the attorney opportunity to be heard, may make such order of suspension or restriction as protection of the public may make appropriate. In the interest of justice, the court, upon application of the attorney, may terminate such suspension at any time after affording Bar Counsel an opportunity to be heard."

Section 12A has been amended effective July 1, 1997. The changes are not significant for the purposes of these cases.

facts: (a) the numerous indictments of March 3, 1997, and the earlier issuance of three search warrants in May, 1996; (b) the conclusions of the judge who issued the search warrants that certain documents seized in the searches were not protected by the attorney-client privilege; (c) the deposition testimony of James Ellis that led to the issuance, on December 12, 1996, of a preliminary injunction against him and the law firm; and (d) on the question of the threat of substantial harm to clients and prospective clients, efforts undertaken by the lawyers, after the search warrants were issued, to restructure the law firm's business to protect their interests in their clients' claims.

(a) The indictments, which concern a variety of alleged wrongs, suggest a pattern of unethical conduct in the lawyers' assertion of clients' personal injury claims. The record of the grand jury proceedings is not before us. We do know that a grand jury must at least hear sufficient evidence to establish probable cause to arrest the accused. See *Commonwealth* v. *O'Dell*, 392 Mass. 445, 451 (1984); *Commonwealth* v. *McCarthy*, 385 Mass. 160, 163 (1982); *Commonwealth* v. *St. Pierre*, 377 Mass. 650, 656-657 & n.6 (1979). Probable cause, in the context of a grand jury, means that the grand jury had reasonably trustworthy information sufficient to warrant a prudent person in believing that the accused had committed the offense charged. See *Commonwealth* v. *O'Dell*, *supra* at 450.

Warrants to search the law offices of Ellis & Ellis and its records storage facility were also issued on probable cause, which means that, as to each warrant, the Superior Court judge who authorized their issuance had before her reasonably trustworthy information sufficient to persuade her that a crime had been committed (*Commonwealth* v. *Snow*, 363 Mass. 778, 784 [1973]; K.B. Smith, Criminal Practice and Procedure § 193, at 137 [2d ed. 1983 & Supp. 1997]) and that the evidence was probably in the place or places to be searched (*Commonwealth* v. *Upton*, 394 Mass. 363, 370 [1985]).

(b) After the search warrants authorizing the search of the law offices of Ellis & Ellis and its storage facility were executed in May, 1996, the Ellises asserted that certain seized documents were protected by the attorney-client privilege and should not be disclosed to the Commonwealth. In response,

the Commonwealth contended that the documents were not privileged because they came within the crime-fraud exception to the attorney-client privilege. The Superior Court judge who had authorized issuance of the search warrants ruled on these contentions. Because the crime-fraud exception focuses not on the attorney's conduct but on whether the client sought the services of a lawyer to enable or aid someone to commit or plan to commit what the client knew or should have known to be a crime (*Purcell* v. *District Attorney for the Suffolk Dist.*, 424 Mass. 109, 112 [1997]), the judge's inquiry did not necessarily involve the question of what wrongs, if any, the seized records showed that the lawyers committed.

The judge tested the applicability of the attorney-client privilege by deciding whether, by a preponderance of the evidence, the Commonwealth had produced "facts sufficient to support a belief by a rational fact-finder that the client alone or in conjunction with his attorney was engaged in the perpetration or attempted perpetration of a crime and the communication was made in furtherance thereof." She ruled that the privilege was inapplicable in many instances. The judge also ruled that the seized documents were not protected from disclosure as opinion work product. She rejected the lawyers' arguments because "[h]ere a *prima facie* showing has been made that James N. Ellis, Jr., and Nicholas Ellis were participants in the fraud."

On the attorney-client privilege issue, the judge stated the following:

> "The evidence is sufficient to support a finding by a rational fact-finder that James N. Ellis, Jr., and Nicholas Ellis engaged in a scheme, along with certain of their clients, to file fraudulent personal injury and workers' compensation claims. In particular, the evidence is sufficient to support findings that James Ellis and Nicholas Ellis and certain of their agents and employees (including nurses and claims adjusters): (1) solicited clients to lie to insurance companies about the severity, location and circumstances of injuries; (2) submitted reports and statements to insurance carriers to obtain total disability benefits with knowledge that the claimants were employed at that time; (3) advised clients to misrepresent their employment and medical histories and inflated and

altered medical bills; and (4) coached clients who were about to undergo medical examinations telling them how to respond to physicians' questions and how to successfully feign and/or exaggerate an injury."

The significance of the judge's conclusions should be measured against the facts that (1) she made her determinations in the absence of a fully adversary hearing and without ruling on matters of credibility and (2) she only ruled that there was evidence that would support the conclusions she recited and that we have just quoted. The statements in bar counsel's briefs that the judge "found" the quoted facts enumerated above is not correct. It is correct, however, that the judge found numerous examples of false presentations of information to insurance companies by clients of Ellis & Ellis. We draw the inference that the lawyers' involvement in presenting these claims was more inappropriate than simply a cavalier indifference to whether the information submitted to insurers was accurate.

(c) On December 12, 1996, a judge in the United States District Court for the District of Massachusetts entered a preliminary order restraining James Ellis and the law firm from disposing of any of their assets, except in the regular course of business. *St. Paul Fire & Marine Ins. Co.* v. *Ellis & Ellis*, 951 F. Supp. 5 (D. Mass. 1996). He did so, on the motion of the insurance company, in a civil action by the insurer because he concluded that the insurer had a reasonable likelihood of success "on its claim that Ellis and the firm of which he is a partner are liable to it for payments made by [the insurer] as a result of the defendants' deceptive and likely fraudulent failure to provide information actually known to them that was material to [the insurer's] payment of workers' compensation benefits to a client of the defendants." *Id.* at 6. In his deposition testimony, James Ellis stated that he and the firm represented a client who had worked successively under two different names and social security numbers for two different employers. The client claimed back injuries on both jobs. James Ellis admitted in his deposition that he had forwarded medical reports to the insurer of the employer in whose employment the second alleged back injury occurred which were inaccurate and incomplete because the client enthad told the doctors treating him for the second claimed injury

that he had had no prior injury to his back.[3] Three of the indictments against James Ellis arise out of the events that led to this civil litigation.

(d) At a time when the lawyers were aware that their practices were under public investigation, they undertook to reorganize the firm's operations to continue its activities in the face of mounting legal problems. The plan that they developed, but never implemented, proposed conduct that would have violated ethical rules. Proposed "management and referral agreement[s]" would have transferred a majority of the firm's caseload to individual attorneys and groups of attorneys who were employees of the firm, in effect splitting the firm into separate entities. The new firms would be affiliated entities of the firm and for a period would be subject to the control and direction of the firm. All records of the new firms would be open to inspection by Ellis & Ellis, and each new firm would have to be available monthly to discuss the status of each case referred to it. This level of control would have violated S.J.C. Rule 3:07, Canon 5, DR 5-107, as appearing in 382 Mass. 782 (1981) (avoiding influence by others than the client) and DR 5-101, as appearing in 382 Mass. 779 (1981) (lawyer should exercise independent judgment). More important is the absence of any recognition that a lawyer may withdraw from a representation and transfer a client's case to another lawyer only with the consent of the client. See S.J.C. Rule 3:07, Canon 2, DR 2-110 (A) (2), and DR 2-110 (C) (5), as appearing in 382 Mass. 774 (1981). Moreover, the proposed agreements called for a divison of fees, called referral fees in the agreement, without any provision for client consent after full disclosure of the circumstances. This arrangement would have violated S.J.C. Rule 3:07, Canon 2, DR 2-107 (A), 382 Mass. 773 (1981).

2. With this factual background, we come to the application of appropriate legal principles and to the legal challenges that the lawyers have raised.

The lawyers challenge the proceedings on due process of law grounds. These objections have largely been addressed and rejected in *Matter of Kenney*, 399 Mass. 431, 435 (1987).

---

[3]James Ellis testified, "I knew that the information as contained in the report of the doctor would not be consistent with my knowledge of what the true facts were." *St. Paul Fire & Marine Ins. Co.* v. *Ellis & Ellis*, 951 F. Supp. 5, 6 n.1 (D. Mass. 1996).

A lawyer has a constitutionally protected property interest in his or her license to practice law, and is entitled to due process before any deprivation of that interest. *Id.* See *Mathews* v. *Eldridge*, 424 U.S. 319, 333 (1976); *In re Ruffalo*, 390 U.S. 544, 550 (1968). Here, each lawyer received notice of the grounds for seeking his temporary suspension and was afforded both a hearing before a single justice of this court at which facts were presented and a hearing before the full court prior to the effectiveness of the order directing his temporary suspension. See *Matter of Kenney*, *supra* at 436. A hearing on the question of a temporary suspension need not provide all the procedural safeguards of a full evidentiary hearing. See *Cleveland Bd. of Educ.* v. *Loudermill*, 470 U.S. 532, 545 (1985) (" 'something less' than a full evidentiary hearing is sufficient prior to adverse administrative action"); *Barry* v. *Barchi*, 443 U.S. 55, 64-65 (1979) (no evidentiary hearing necessary before interim suspension of horse trainer's license where probable cause exists to believe horse had been drugged and trainer had at least been negligent). Of course, once a temporary order is entered, formal disciplinary hearings must be instituted within a reasonable time. *Matter of Kenney*, *supra* at 437. See *Cleveland Bd. of Educ.* v. *Loudermill*, *supra* at 547; *Barry* v. *Barchi*, *supra* at 66.[4]

The lawyers claim further that the proceedings are procedurally invalid because decisions should not be made based on evidence to which they did not have access. See *Greene* v. *McElroy*, 360 U.S. 474, 496 (1959). As we stated earlier, however, there was adequate evidence in the record before the single justice to prompt us to affirm the orders of temporary suspensions.

Although § 12A does not announce that principles applicable to the issuance of a preliminary injunction should guide the temporary suspension issue, those principles are instructive. See *Packaging Indus. Group, Inc.* v. *Cheney*, 380 Mass. 609, 616-617 (1980). However, as § 12A states, the public interest replaces irreparable harm to the moving party as a factor in deciding whether to grant preliminary relief. See *Commonwealth* v. *Mass. CRINC*, 392 Mass. 79, 89-90 (1984). In assessing each party's chances of success in the proceed-

---

[4]The Board of Bar Overseers and bar counsel should expedite disciplinary proceedings unless the lawyers request otherwise.

ings, it is important first to determine what evidence, if any, may properly be considered in passing on that question.

The lawyers assert that we may not properly rely on indictments and search warrants because they should not be presumed to be regular. They argue that they are based on evidence that was obtained "by means of a privatized prosecutorial apparatus." They refer to the statutorily directed collaboration between (a) the Massachusetts insurance fraud bureau, a private investigative agency funded by two insurance organizations (St. 1990, c. 338, § 1, as amended by St. 1991, c. 99, § 1), and (b) the Attorney General's insurance fraud division, which is funded by assessments against the same insurance organizations (St. 1991, c. 399, § 3, as amended by St. 1995, c. 38, § 210). Assistant attorneys general working in the Attorney General's insurance fraud division will, in a sense, be compensated indirectly from the funds collected pursuant to the assessments. The lawyers base their argument on the principle that the statutory scheme under which the Attorney General's insurance fraud division operates injects private parties' financial interests into the enforcement process, thus depriving the lawyers of their right to a disinterested prosecutor. See *Young* v. *United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 808-809 (1987); *Marshall* v. *Jerrico, Inc.*, 446 U.S. 238, 250 (1980); *Commonwealth* v. *Tabor*, 376 Mass. 811, 817-818 (1978); *People* v. *Eubanks*, 14 Cal. 4th 580, 584, 596 (1996).

Whatever the consequences of that relationship may be in the criminal proceedings against the lawyers, on the record in this civil proceeding we see no impropriety in our relying, in part, both on the fact of the indictments and on the fact of the issuance of the search warrants to decide whether the evidence calls for an order of temporary suspension. We acknowledge that an indictment does not alone justify the temporary suspension of a lawyer's right to practice law. See S.J.C. Rule 4:01, § 12, 365 Mass. 696 (1974). Indeed, our disciplinary procedure does not even compel the temporary suspension of a lawyer who has been convicted of a serious crime. *Id.*

The evidence before the single justice persuades us that it is more probable than not that the lawyers violated important provisions of that Code. It is true that certain facts that we have recited were not established by a preponderance of the

evidence. Taken cumulatively, however, all the facts show the lawyers' misconduct by a preponderance of the evidence. That is enough. See *Care & Protection of Laura*, 414 Mass. 788, 793 (1993). See also *Commonwealth* v. *Rojas*, 388 Mass. 626, 629-630 (1983) (although each element of a crime must be proved beyond a reasonable doubt, each fact on which the trier of fact relies in reaching such a conclusion need not be found beyond a reasonable doubt). The grand jury concluded that there was reasonably trustworthy information sufficient to warrant a reasonable person in believing that each lawyer had committed numerous crimes. Although, standing alone, the fact of the indictments could not justify temporary suspensions pursuant to § 12A, the indictments are relevant to the temporary suspension question, and we may consider them along with the other evidence in the record. Similarly, the determination of the Superior Court judge that search warrants should issue shows that she also concluded that there was reasonably trustworthy information that a crime or crimes had been committed. Thus, the fact of the issuance of the warrants is relevant to the suspension question and may properly be put on the scale. The findings of the judge concerning the evidence of fraud and improper claims practices of Ellis & Ellis are powerful indicators of wrongdoing because her conclusions were based on the lawyers' client files that were before her.

In a preliminary hearing, the entire controversy cannot be resolved, but we may and do rely on the strength of the preliminary showing of a multitude of probable cause and prima facie conclusions that numerous crimes were committed involving serious ethical violations and that numerous fraudulent claims were presented. As to James Ellis, the Federal judge's determination, based on Ellis's own deposition testimony, that a preliminary injunction should be issued against him and Ellis & Ellis further justifies our conclusion that he (and his firm) engaged in serious unethical conduct.

The fact that violations of ethical standards have been shown likely to have occurred does not end the temporary suspension discussion. We must balance the harm to the lawyers against the public interest in preventing harm to present and future clients and in preventing any other harm that should be guarded against.

The harm to a lawyer that will come from the suspension

of his right to practice law is obviously substantial. Not only will the lawyer lose his clients (at least during the period of suspension), but his reputation will probably be damaged in a way that cannot be repaired even if the lawyer later receives total vindication in the disciplinary process.[5] The lawyer who loses his practice may well be adversely affected in the defense of criminal and disciplinary charges arising from the alleged misconduct, at least in his ability to afford counsel. Moreover, a temporary suspension can burden the lawyer's clients who must seek representation elsewhere at the risk of delay and greater expense. Because of the substantial and likely harm that would arise from a temporary suspension that later proves to have been entered improvidently, § 12A requires that there be a showing of a threat of future harm that in the public interest must be guarded against by a temporary suspension.

The pattern of conduct of the lawyers persuades us that there is a substantial risk of future harm to the public interest, including harm to present and future clients. We are not dealing here with a single instance of misrepresentation of fact to an insurance company. Although collusive wrongdoing between a client and a lawyer of the type involved here is difficult to discover, there are numerous examples of such conduct in the record. The lawyers' willingness to engage in such conduct has led to the indictment of certain of their clients, whom they aided in wrongdoing, and raises serious doubts about their conduct and its impact on their clients if they are allowed to continue to practice law.[6] In addition, the lawyers' plan to try to save their interests in their law practice, in the face of investigations by prosecutors and bar counsel, by establishing seemingly independent but controlled entities and by transferring clients' cases as if they were accounts re-

---

[5] The lawyers make no claim that temporary suspension from the practice of law would be unfair because the period of any such suspension would exceed the discipline that would be imposed on proof of the disciplinary misconduct alleged in these cases.

Bar counsel proceeded with reasonable dispatch to seek orders of temporary suspension once the lawyers were indicted. The fact that a lawyer has been indicted for wrongs allegedly committed in the practice of law raises a particular concern.

[6] The fact of the indictment of clients appears in the briefs of the parties. In various indictments of the lawyers, clients are referred to as coconspirators.

ceivable, demonstrates an indifference to ethical considerations and an inclination to engage in unethical conduct.

3. The orders of temporary suspension are affirmed. A further order shall be entered in the county court pursuant to S.J.C. Rule 4:01, § 17, 365 Mass. 710 (1974).

*So ordered.*